# United States Court of Appeals for the Federal Circuit

2006-1286
(Serial No. 09/461,742)


IN RE STEPHEN W. COMISKEY


Thomas J. Scott, Jr., Goodwin Procter LLP, of Washington, DC, filed a combined petition for panel rehearing and rehearing en banc for appellant.

Raymond T. Chen, Acting Solicitor, United States Patent and Trademark Office, of Arlington, Virginia, filed a response to the petition for the Director of the United States Patent and Trademark Office. With him on the response was Thomas W. Krause, Associate Solicitor.

Appealed from:    United States Patent and Trademark Office
                    Board of Patent Appeals and Interferences

# United States Court of Appeals for the Federal Circuit

2006-1286
(Serial No. 09/461,742)

IN RE STEPHEN W. COMISKEY

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

ON PETITION FOR REHEARING EN BANC

Before MICHEL, Chief Judge, NEWMAN, MAYER, LOURIE, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, PROST, and MOORE, Circuit Judges.

PER CURIAM.

Concurring opinion filed by DYK, Circuit Judge, in which MICHEL, Chief Judge, and PROST, Circuit Judge, join. Concurring opinion filed by LOURIE, Circuit Judge. Dissenting opinion filed by MOORE, Circuit Judge, in which NEWMAN and RADER, Circuit Judges, join. Dissenting opinion filed by NEWMAN, Circuit Judge. NEWMAN, MAYER, RADER, BRYSON, and MOORE, Circuit Judges, would grant rehearing en banc with full briefing and argument rather than for the limited purpose of authorizing the panel to revise its opinion.

## O R D E R

This case was decided by a panel of three judges. A petition for rehearing en banc was filed by the Appellant, and a response was invited by the court and filed by the Appellee. The petition for rehearing en banc and response having been referred to the circuit judges who are in regular active service, and a poll having been requested and taken,

IT IS ORDERED THAT:

Rehearing en banc is granted for the limited purpose of authorizing the panel to revise its opinion.

The judgment of the court entered on September 20, 2007, and reported at 499 F.3d 1365 (Fed. Cir. 2007), is hereby vacated, and the opinion of the court accompanying the judgment is withdrawn.

The en banc court returns this appeal to the merits panel, which issues the revised opinion that accompanies this order.

FOR THE COURT

January 13, 2009                                              /s/ Jan Horbaly
    Date                                                     Jan Horbaly
                                              Clerk

cc:    Thomas J. Scott, Jr., Esq.
        Raymond T. Chen, Esq.

# United States Court of Appeals for the Federal Circuit

2006-1286
(Serial No. 09/461,742)


IN RE STEPHEN W. COMISKEY


Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.


DYK, Circuit Judge, with whom MICHEL, Chief Judge, and PROST, Circuit Judge, join, concurring.

Contrary to Judge Moore's dissent, the panel decision is entirely consistent with precedent allowing an appellate tribunal to affirm an agency on alternative legal grounds or to remand to the agency to consider an alternative ground. This authority is, in fact, so well-established that the petition for rehearing did not even raise the issue.

1.  The dissent recognizes that under SEC v. Chenery Corp., 318 U.S. 80, 88 (1943), we may affirm an agency on a legal ground not decided by the agency. Dissenting op. at 4-5. Chenery itself is explicit on the point, 318 U.S. at 88, and we have repeatedly recognized that we possess such authority. See, e.g., Newhouse v. Nicholson, 497 F.3d 1298, 1301 (Fed. Cir. 2007) ("Thus, the Chenery doctrine is not implicated when the new ground for affirmance is not one that calls for a determination or judgment which an administrative agency alone is authorized to make." (internal quotation marks omitted)). However, the dissent appears to contend that under Chenery our court lacks power to uphold the Board's rejection on alternative legal grounds without first deciding that the original ground was erroneous. There is no

authority cited in support of this view, and it is well established that an appellate court has the power to decide a case on alternative legal grounds without addressing the original ground for decision. For example, the Supreme Court did precisely this in Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 384 n.12 (1997), in the face of a dissent. In that case, the district court issued a "cease and desist" provision as part of an injunction. Although the Court expressed "doubt" as to whether "the District Court's reason" was correct, it nevertheless upheld the "cease and desist" provision on alternative legal grounds without deciding whether the district court's rationale was correct or incorrect. Id. at 383-84. Notably, and relying in part on Chenery, the Supreme Court majority flatly rejected the dissent's objection that this was impermissible as "inconsistent with our precedents." Id. at 384 n.12. Schenck is governing authority that an appellate court may substitute a new ground for decision without rejecting the original ground. Our sister circuits have repeatedly recognized and exercised such authority,[1] as have we.[2] Indeed, we have done so explicitly in administrative proceedings.

---

[1] See, e.g., Arakaki v. Lingle, 477 F.3d 1048, 1066 (9th Cir. 2007) ("We do not reach the issue whether Plaintiffs' breach of trust claim is otherwise cognizable under the common law of trusts, which was the basis of the district court's dismissal of the breach of trust claim against OHA. Rather, we affirm the dismissal on the alternative ground that Plaintiffs cannot demonstrate standing to sue an indispensable party."); Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1164 n.1 (1st Cir. 2002) (affirming judgment on alternative legal ground not adopted by district court while acknowledging district court's ground was not incorrect).

[2] See, e.g., Star-Glo Assocs., LP v. United States, 414 F.3d 1349, 1350 (Fed. Cir. 2005) ("[W]e do not reach the exhaustion issue. We instead affirm on the alternative ground that the statute does not entitle appellants to additional compensation."); Boli v. United States, 831 F.2d 276, 278 (Fed. Cir. 1987) ("We therefore affirm the judgment of the Claims Court on this alternative ground and find it unnecessary to reach the constitutional issue [that the Claims Court relied upon in dismissing the complaint].").

In Koyo Seiko Co. v. United States, we held that we need not reach the ground relied upon below because "[w]e find it unnecessary to decide that question. We conclude that the judgment of the Court of International Trade . . . appropriately should be affirmed on a clearer and simpler alternative ground." 95 F.3d 1094, 1098 (Fed. Cir. 1996) (emphases added). The court discussed Chenery at length:

> The . . . question is whether our affirmance of the judgment of the Court of International Trade on a ground other than that the court or the agency gave is consistent with the Supreme Court's decision in SEC v. Chenery Corp., 318 U.S. 80 (1943) ("Chenery"). We conclude that it is.
>
> . . . .
>
> In Chenery, the Commission's determination whether the reorganization plan met the standards of the Holding Company Act involved and required the exercise of the broad discretion Congress had given the agency in applying those indeterminate standards. It was "a determination or judgment which an administrative agency alone is authorized to make," id. at 88, one reflecting "'its special administrative competence.'" Chenery, 318 U.S. at 92.
>
> In the present case, in contrast, the sole issue is one of statutory construction . . . . That is not "a determination or judgment which an administrative agency alone is authorized to make." Chenery, 332 U.S. at 196. As we have concluded, the plain language of the statute compels the conclusion that the cap does not cover that situation. Unlike the situation in Chenery, the answer to that question does not require or implicate the exercise of agency discretion in applying subtle and complex statutory standards to particular facts.

Id. at 1099-1101 (internal citations omitted); see also GTE South, Inc. v. Morrison, 199 F.3d 733, 741-42 (4th Cir. 1999) (citing Koyo Seiko). Indisputably statutory subject matter is not a determination which the Patent & Trademark Office alone is authorized to make. See Merck & Co., Inc. v. Kessler, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996) (no deference to Patent & Trademark Office on substantive patent law issues).

2. It is also well within the power of an appellate court to remand a case for

consideration of an alternative issue that might obviate the need to decide the ground of the trial tribunal's decision, as the panel decision does in part. One such example is the Supreme Court's decision in Dretke v. Haley, 541 U.S. 386, 388-89 (2004). There, the Supreme Court declined to rule on the district court's application of the "actual innocence" doctrine in a habeas petition, noting that there were alternative legal grounds that the district court could consider. Remanding for a ruling on the alternative grounds "might obviate any need to reach" the "difficult questions regarding the scope of the actual innocence exception" implicated by the district court's ground for decision. Id. at 389, 396. Our sister circuits have done the same.[3]

This is once again no less true in the administrative context. For example, the Second Circuit in Butt v. Gonzales, 500 F.3d 130, 132-33 (2d Cir. 2007), "decline[d] to consider" the ground that was the basis for the agency's decision and was the principal issue argued on appeal, and instead remanded to the agency for consideration of antecedent issues.

3. Nor is the dissent correct that § 706 of the Administrative Procedure Act imposes some special requirement in agency proceedings that the agency's ground first be rejected. Section 706 states in relevant part: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or

---

[3] See, e.g., Carpenter Tech. Corp. v. City of Bridgeport, 180 F.3d 93, 98-99 (2d Cir. 1999) (declining to rule on district court's ground of decision and remanding for reconsideration); Thompson v. County of Franklin, 15 F.3d 245, 253 (2d Cir. 1994) (remanding case to develop and analyze record rather than ruling on alternative ground of dismissal in the first instance); Allen v. Aytch, 535 F.2d 817, 818 (3d Cir. 1976) (declining to rule on constitutional question and remanding to district court for consideration of alternative ground).

applicability of the terms of an agency action." 5 U.S.C. § 706. The dissent suggests that this language requires that we decide every issue presented on review. Dissenting op. at 8. Rather, the purpose of the mandatory language is to ensure that the reviewing court does not affirm the agency decision without first considering all bases for challenging an agency decision. See, e.g., Charlton v. United States, 412 F.2d 390, 391-393 (3d Cir. 1969) (reversing district court's decision because it violated § 706 by dismissing challenge to agency action without considering the basis for challenge). It does not require the decision of issues that are not "relevant." The statute and cases make clear that the reviewing court need not decide the validity of every ground for affirming the agency decision. See 5 U.S.C. § 706 (review need not extend beyond "the extent necessary to decision").

4. The panel here did not suggest that the court should reach new issues not decided below as a normal practice, but the facts of this case present unusual circumstances. The panel concluded that the § 103 rejection raised serious questions. Also, in an ex parte Patent & Trademark Office proceeding, there is no adverse party who could have raised the issue of statutory subject matter. The § 101 issue was fully briefed on appeal in this case at the court's invitation, and in its response the Patent & Trademark Office noted that "[a] well-considered, precedential decision of this Court would give the Office needed guidance in this area." Patent & Trademark Office Supp. Letter Br. 15. We concluded that addressing the issue was both desirable and appropriate.

# United States Court of Appeals for the Federal Circuit

2006-1286
(Serial No. 09/461,742)

IN RE STEPHEN W. COMISKEY

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

LOURIE, <u>Circuit Judge</u>, concurring in the denial of the petition for further rehearing en banc.

I concur in the court's decision to take this case en banc, vacate the prior panel decision, and return it to the panel for disposition in the manner reflected in the opinion issued today. I do so even though I am sympathetic to Judge Moore's dissent. I believe the panel should have originally decided the appeal on the grounds appealed to us from the Patent Office's decision. However, having rendered the decision that it did, and which it now reaffirms as to the method claims, I do not believe we need to unwind the panel decision as to those claims in order to review the § 103 rejections. The panel was and is correct that the method claims do not pass muster under 35 U.S.C. § 101, and more uncertainty in the perceived state of the law that would be engendered by vacating that conclusion is not necessary or desirable.

I also concur in the court's decision to take this case en banc only for the limited purpose of remanding to the panel to vacate the issued opinion, rather than totally declining to take it en banc, another option. I do so because, under that option, the

original opinion would stand, and, in my view, the original opinion states propositions contrary to law. Those propositions particularly include the conclusion that the system claims recite patent-eligible subject matter under § 101. In re Comiskey, 499 F.3d 1365, 1380 (Fed. Cir. 2007) ("[I]ndependent claims 17 and 46 . . . claim patentable subject matter under § 101 . . . ."). The panel also stated that "claims 17 and 46 at most merely add a modern general purpose computer to an otherwise unpatentable mental process . . . ." Id. Thus, it remanded those claims for further treatment "to determine in the first instance whether the addition of general purpose computers or modern communication devices to Comiskey's otherwise unpatentable mental process would have been non-obvious to a person of ordinary skill in the art." Id. at 1380-81. The implication of these statements is that the "otherwise unpatentable mental process" is prior art, which I believe is incorrect. Prior art is that which is defined in § 102, not that which is patent-ineligible subject matter under § 101.

Thus, I concur in the court's decision.

# United States Court of Appeals for the Federal Circuit

2006-1286
(Serial No. 09/461,742)

IN RE STEPHEN W. COMISKEY

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

MOORE, Circuit Judge, with whom NEWMAN and RADER, Circuit Judges, join dissenting from the denial of the petition for rehearing en banc.

This case goes to the fundamental role of the appellate court—to review the decision appealed. In this case, the court declined to address the only ground for rejecting the patent claims decided below and appealed by the parties (§ 103). Instead, the court reached out to decide a new ground of rejection (§ 101), raised sua sponte by the court. The court evaluated both the process and machine claims under its chosen ground, § 101, concluding that the process claims were not directed to patentable subject matter, but that the machine claims, in light of our well-established precedent were directed to patentable subject matter. This resulted in affirming the rejection of the process claims albeit on a different ground and remanding the rejection of the machine claims without ever addressing the obviousness rejection by the PTO. Today, the en banc court vacates the original Comiskey opinion and permits the panel to revise it. The only change the panel makes is to remand the uncontroversial determination that

the machine claims are in fact directed to patentable subject matter. Why remand the machine claims and not the process claims? More importantly, why remand when the PTO already rejected the system claims as obvious. Given that the court has pointed to no flaw in the agency's obviousness rejection, the court's decision in Comiskey amounts to a wasteful remand.

Because I believe that this decision is in conflict with our well settled precedent that we will not consider a new ground of rejection on appeal and with Supreme Court precedent that outlines the narrow instances in which an appellate court can affirm an agency determination on a ground not considered by the agency in the first instance, I must respectfully dissent. The majority's decision to reject the process claims on a ground never raised by either party and not to resolve the rejection of the system claims (without finding any fault in the agency's decision making) is not consistent with the need to respect and recognize agency expertise or the interests of agency or judicial economy.

I.

Mr. Comiskey filed his patent application in 1999 with the United States Patent and Trademark Office (PTO). It contained two types of claims: system claims directed to computer modules (claims 15, 17-31, 44, and 46-59) and process claims directed to methods for mandatory arbitration resolution (claims 1-14, 16, 32-43, and 45). In the course of prosecution, the patent examiner issued five office actions rejecting both his system and process claims as obvious under § 103. In response, Mr. Comiskey submitted arguments, claim amendments, a request for continued examination, and declarations to the PTO in an attempt to overcome the examiner's rejection. When the

examiner maintained his rejection of all the claims as obvious under § 103, Mr. Comiskey appealed the obviousness rejections to the Board. The Board affirmed the examiner's rejections of both the process and system claims as obvious. Mr. Comiskey then brought his nearly decade-old dispute with the PTO to this court, seeking relief from what he considered inappropriate obviousness rejections.

Despite being the only ground upon which the patent was ever rejected and the only ground argued by the PTO, the court in Comiskey did not review the PTO's determination that the system and process claims were obvious. Instead, the court on its own initiative considered whether the claims were directed to patentable subject matter pursuant to § 101—a rejection never made by the agency or presented on appeal.[1] The court concluded that the process claims were directed to unpatentable subject matter but that the system claims recited patentable subject matter. In re Comiskey, 499 F.3d 1365, 1381 (Fed. Cir. 2007). Then, the court remanded the system claims back to the PTO for the agency to consider whether the system claims are

---

[1] In fact, during oral argument, counsel for the PTO was clearly puzzled by the panel's suggestion that it could affirm on an alternative ground: "When I think about a question like that, I think of this court's role as an appellate court which is supposedly empowered to review the decisions of the lower tribunal." Oral Arg. 21:48-22:00, available at http://oralarguments.cafc.uscourts.gov/mp3/2006-1286.mp3. When pressed, counsel added: "[I]t would be unusual—I've never seen it my nine years— where this court has affirmed on a completely different ground." Id. at 22:07-22:21. After surprising Mr. Comiskey and the PTO with its questions directed to § 101 during oral argument, the panel asked the parties to submit letter briefs of no more than 7000 words limited to the issue of whether Mr. Comiskey's claims were directed to patentable subject matter under § 101. Nowhere in its brief did the PTO address the propriety of this court reaching a new ground of rejection on appeal, likely because of the limited scope of the supplemental briefing. Nonetheless, Mr. Comiskey spent half of his short brief objecting to the panel reaching a different ground of rejection on appeal. Mr. Comiskey had no opportunity to consider or respond to any of the PTO arguments on this entirely new ground of rejection as both briefs were due simultaneously.

obvious—the same basis upon which the PTO had consistently rejected the claims and upon which this appeal had been briefed and argued. Id. at 1368, 1380-81. The court pointed to no error or flaw in the PTO decision nor did the court cite any need for further development of the record or a need for a more detailed analysis.[2] The court simply declined to review the issue. The court chose a new ground of rejection on appeal, concluded it did not warrant rejection of the system claims, and then remanded them— all without considering the actual agency decision at issue in the appeal—that the system claims were obvious. Today our en banc court vacated that Comiskey decision. Rather than take the case en banc and address the issue actually decided below, raised, briefed and argued by the parties—whether the claims are obvious, we returned the case to the panel. Today's panel opinion leaves intact the court's refusal to address the obviousness rejection made by the PTO and the court's decision to affirm the rejection of the process claims sua sponte on § 101. This new panel opinion, however, remands the machine claims to the PTO to consider in the first instance whether they recite patentable subject matter under § 101.

II.

The Comiskey court justified reaching out to decide a new ground of rejection on appeal by distinguishing this case on the basis that the new ground of rejection— whether a claim is patent eligible—is a question of law. The Comiskey court holds that

---

[2]     Neither the original opinion in Comiskey nor the revised opinion which issues today contains any discussion of the obviousness rejection actually made. Now, after the bell has rung, the concurrence suggests "the § 103 rejection raised serious concerns." What were those concerns? The bar, the PTO, and I are all left to wonder. Instead of reviewing what appears to be a straight-forward obviousness rejection based upon prior art, the panel decided one of the broadest, most sweeping issues in patent law – one whose impact will far exceed this case – the contours of patentable subject matter. See infra n.6.

"a reviewing court can (and should) affirm an agency decision on a legal ground not relied upon by the agency" and cites Securities & Exchange Commission v. Chenery Corp., 318 U.S. 80 (1943). Comiskey, 499 F.3d at 1372. The Comiskey court erred, however, in treating this as the only limitation on the appellate court's ability to decide new legal issues on appeal from agency actions. The Supreme Court did not intend Chenery to be an open invitation for appellate courts to consider in the first instance any legal ground of its choosing for reviewing agency decisions whether it results in affirmance or not. Chenery holds that an appellate court can reach an alternative legal ground (1) in order to affirm an agency (2) when the agency ground was erroneous because it would be wasteful to remand the case under these circumstances.

> [I]n reviewing the decision of a lower court, it must be affirmed if the result is correct "although the lower court relied upon a wrong ground or gave a wrong reason." The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate.

Chenery, 318 U.S. at 459 (citation omitted). The Comiskey panel identified no wrong ground or wrong reason for the PTO's § 103 rejection.[3] The court pointed to no need

---

[3]    We recognized in our en banc decision in Bilski that "although our decision in Comiskey may be misread by some as requiring in every case that the examiner conduct a § 101 analysis before assessing any other issue of patentability, we did not so hold." In re Bilski, No. 2007-1130, slip op. at 4-5 n.1 (Fed. Cir. Oct. 30, 2008) (en banc). In fact, the Supreme Court itself declined to address complicated § 101 issues even where fully briefed and argued because the obviousness rejection (also fully briefed and argued) provided an easier ground upon which to affirm:

> Petitioner and respondent, as well as various amici, have presented lengthy arguments addressed to the question of the general patentability of computer programs [under §101]. We find no need to treat that question in this case, however, because we conclude that in any event respondent's system is unpatentable on grounds of obviousness.

for additional evidence, fact findings, or legal analysis.  The court in <u>Comiskey</u> did not even consider whether the PTO's rejection of the claims under § 103 was correct.  The <u>Comiskey</u> court decided that, instead of considering the issue actually on appeal, it would decide a different legal issue not decided by the agency or raised by the parties— whether the claims recite patentable subject matter under § 101.  The <u>Comiskey</u> court cannot justify its decision by arguing that it avoided a wasteful remand because it never concluded that the agency's obviousness rejection was erroneous.[4]  Indeed, the <u>Comiskey</u> court made no decision that remand would have been necessary.

Perhaps most troubling, the court refused to consider whether the system claims were obvious but instead remanded for the PTO to consider whether these claims are directed to patentable subject matter.  The PTO and the applicant spent nearly a decade fighting over the obviousness of the system claims.  The obviousness of the

---

<u>Dann v. Johnston</u>, 425 U.S. 219, 220 (1976).  The PTO committed no error in choosing to reject under § 103 rather than § 101.  The majority points to no other potential error that justifies departing from the agency ground.

[4]     Nor can the concurrence justify the <u>Comiskey</u> decision with <u>Schenck v. Pro-Choice Network of Western New York</u>, 519 U.S. 357 (1997).  <u>Schenck</u> does not free appellate courts from the restrictions set forth in <u>Chenery</u>.  In <u>Schenck</u>, the parties appealed the propriety of the injunction in light of intervening precedent, <u>Madsen v. Women's Health Center, Inc.</u>, 512 U.S. 753 (1994), that was decided after the district court issued the injunction.  After expressing doubt over the Court's ability to affirm the injunction on the basis provided by the district court, the Court decided that the case could be resolved in light of its intervening precedent, <u>Madsen</u>.  <u>Schenck</u>, 519 U.S. at 383-84; <u>see also</u> <u>id</u>. at 386 (concluding that the district court erred in its reasoning) (Scalia, J. dissenting).  In contrast, the <u>Comiskey</u> court expressed no opinion whatsoever regarding the § 103 rejection on appeal.  Nor was the court's alternative basis, § 101, justified in view of any new or intervening precedent.  Nor did the parties raise the § 101 issue on appeal.  Finally, the new ground which the <u>Comiskey</u> court reached did not result in affirmance, but rather warranted a remand.  <u>Comiskey</u> bears little resemblance to <u>Schenck</u>.

system claims was the only basis for rejection of the system claims in the PTO, affirmance by the Board, and appeal to this court. This court did not decide the fully briefed and argued issue of whether the system claims were properly rejected as obvious. Instead the court decides that the PTO should consider whether the system claims can be rejected as unpatentable subject matter under § 101. Given that the PTO's original obviousness rejection still stands, there can be no conclusion but that the panel's choice resulted in exactly the sort of wasteful remand that Chenery sought to avoid. The panel decision forces Mr. Comiskey, the PTO, and the courts to continue litigating the very issues that they have already been litigating for ten years and that were squarely presented to this court for decision.[5]

---

[5] The cases cited by the concurrence do not justify remanding in Comiskey. In those cases, remand was necessitated by the Constitutional avoidance doctrine or inadequate records. In Dretke v. Haley, the Supreme Court held that courts "must first address all non-defaulted claims for comparable relief and other grounds for cause to excuse the procedural default" before reaching the issue of the actual innocence exception to procedural default of constitutional claims. 541 U.S. 386, 393-94 (2004). The Court explained that the actual innocence issue is a "difficult question" that implicated "a complex and evolving body of equitable principles" and therefore should be treated like the doctrine of Constitutional avoidance. Id. at 392-96. As such, the Court remanded for consideration of the "viable and significant ineffective assistance of counsel claim." Id. at 394; see also Allen v. Aytch, 535 F.2d 817 (3d Cir. 1976) (remanding to the district court for consideration of alternative ground which did not involve Constitutional issues rather than reach out to decide an unnecessary Constitutional issue). Comiskey does not pertain to Constitutional avoidance. Moreover, the Comiskey court did not point to any flaw in the PTO's obviousness rejection or inadequate record before the PTO which would justify remand. See Butt v. Gonzales, 500 F.3d 130, 135, 137 (2d Cir. 2007) (declining to resolve issue where "the record is unclear" and where there are statutory ambiguities "in a complex statutory scheme [] best addressed, in the first instance, by the expert agency in charge of administering it"); Thompson v. County of Franklin, 15 F.3d 245, 253-54 (2d Cir. 1994) (remanding res judicata issue because issue was "briefed and argued only cursorily" on appeal and the issue required "a detailed analysis of a developed record"); Carpenter Tech. Corp. v. City of Bridgeport, 180 F.3d 93, 98-99 (2d Cir. 1999) (remanding ripeness issue in view of arguments on appeal because district court decision was unclear and itself sua sponte, and because remand was already necessitated for

The PTO rejected these claims as obvious—how can we refuse to review that rejection? We cannot sidestep issues that could fully resolve an appeal. Courts have a "virtually unflagging obligation" to resolve cases or controversies within their jurisdiction. Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). "Judicial power is inseparably connected with the judicial duty to decide cases and controversies by determining the parties' legal rights and obligations." O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 1014 (10th Cir. 2004), aff'd, 546 U.S. 418 (2006). We must fully resolve appeals not only because of our constitutional duty, but also for practical reasons. See Toews v. United States, 376 F.3d 1371, 1381 (Fed. Cir. 2004) ("[C]ourts have a duty to decide the cases before them whenever it reasonably can be done. Basic fairness, avoidance of unwarranted delay and the imposition of additional costs on the parties, and conservation of judicial resources, all dictate that we should decide this case since on the law we can."); Epperson v. Arkansas, 393 U.S. 97, 102 (1968) ("[T]he present case was brought, the appeal as of right is properly here, and it is our duty to decide the issues presented."); United States v. Booker, 375 F.3d 508, 513 (7th Cir. 2004) ("[W]e cannot avoid the duty to decide an issue squarely presented to us."); see also 35 U.S.C. § 144.

The Administrative Procedure Act (APA), which governs our review of appeals from the PTO, see Zurko, 527 U.S. 150, states that "to the extent necessary to the decision and when presented, the reviewing court shall decide all relevant questions of law." 5 U.S.C. § 706. The obviousness of the system claims is a relevant question of

consideration of injunctive relief). Comiskey could not be more different from these cases.

law; in fact it was the only question of law presented by the agency on the record in this appeal. Deciding this question of law was "necessary to the decision." Id. Yet, the panel—without explanation and contrary to its obligation—declined to review the PTO's obviousness rejections.

Our task is to review a PTO decision, not to direct its examination. Section 144 of the Patent Act states that our court "shall review the decision . . . on the record before the Patent and Trademark Office." Our court is now apparently doing more than reviewing on the record; it is directing the examination, failing to review the decision the PTO has rendered and telling it what alternative possible ground of rejection should be evaluated. With all due respect, I do not believe we have a roving commission to manage the examination process. Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

The agency has the discretion to select the bases for its actions. See Kevin M. Stack, The Constitutional Foundations of Chenery, 116 Yale L.J. 952, 980 (2007) (arguing that "the power to select the rationale for an agency's action must be understood as an essential element of that action, a matter over which the agency has exclusive power"). Indeed, in this case the PTO exercised that discretion. See Oral Arg. 17:30-17:42 ("Whether or not there should be a 101 issue here, but for a few different reasons we elected to just go ahead and go forward with the rejections as they are in front of us today."). And perhaps more importantly, if the PTO determines the

claims are unpatentable due to obviousness, it is irrelevant whether they also recite

unpatentable subject matter.[6]

B.

The court in Comiskey violates our well established precedent that this court will

not consider new grounds of rejecting patent claims on appeal. See In re Watts, 354

F.3d 1362, 1367-68 (Fed. Cir. 2004) (stating that "a new ground of rejection . . . cannot

be substituted on appeal for the ground relied upon by the Board"); In re Thrift, 298 F.3d

1357, 1367 (Fed. Cir. 2002) ("Whatever merit there is to the PTO's defense of the

rejection of claim 14 raised in its brief submitted to this court, that ground does not

appear in the Board's decision and may not be the basis for affirmance."); In re Zurko,

258 F.3d 1379, 1385, 1386 n.2 (Fed. Cir. 2001), on remand from Dickinson v. Zurko,

527 U.S. 150 (1999) ("[W]e cannot accept the Commissioner's invitation to now search

the record for references in support of the Board's general conclusions concerning the

prior art. Even if any such references could support these conclusions, it would be

---

[6] There are, to be sure, times when courts decline to resolve a complicated, sweeping, difficult question that is appealed, in favor of affirming on a "clearer and simpler alternative ground." Koyo Seiko Co. v. United States, 95 F.3d 1094, 1098 (Fed. Cir. 1996). The Comiskey court did the exact opposite. Mr. Comiskey appealed a straightforward, prior art based obviousness rejection. Instead of addressing this clear and simple ground, the court elected sua sponte to decide one of the most far reaching and important patentability issues—the scope of patentable subject matter under § 101. Although the § 101 question precipitated at least 30 amicus briefs in Bilski, the Comiskey court reached the issue when it had not been raised, briefed or argued by the parties below, not decided by the Board, and not raised on appeal by any of the parties. It would seem prudent, with so much at stake, that the court only decide such an important issue when it has been decided below, then properly raised, briefed, and argued on appeal. Cf. Br. for the United States as Amicus Curiae at *19, Lab. Corp. of Am. Holdings v. Metabolite Labs. Inc., 548 U.S. 148 (2006) (No. 04-607), 2005 WL 2072283 (arguing in opposition to granting the petition for certiorari on § 101 that "if this Court were to consider reevaluating almost a quarter-century of administrative practice and lower court jurisprudence, it should do so based on a full record in a case where the issue was properly raised, litigated, and decided below").

inappropriate for us to consider references not relied upon by the Board."); In re Dembiczak, 175 F.3d 994, 1000-01 (Fed. Cir. 1999) (refusing to consider an obviousness rejection raised for the first time on appeal from the PTO); In re Robertson, 169 F.3d 743, 746 (Fed. Cir. 1999) ("We decline to consider counsel's newly-minted theory as an alternative ground for upholding the agency's decision."); In re Soni, 54 F.3d 746, 751 (Fed. Cir. 1995) (refusing to consider a new theory for affirming an obviousness rejection raised for the first time on appeal); In re Epstein, 32 F.3d 1559, 1564 n.3 (Fed. Cir. 1994) (refusing to consider rejections under § 102(a) and (g) presented for the first time on appeal); Chester v. Miller, 906 F.2d 1574, 1578 n.6 (Fed. Cir. 1990) ("This court will not consider arguments that were not timely raised before the Board."); Titanium Metals Corp. v. Banner, 778 F.2d 775, 779-80 (Fed. Cir. 1985) ("The PTO Solicitor developed a new theory in his brief, never propounded by either the examiner or the board, to support a § 102 rejection . . . but that was clearly beyond his province and we disregard it as amounting to a new ground of rejection." (internal footnote omitted)); In re De Blauwe, 736 F.2d 699, 705 n.7 (Fed. Cir. 1984) ("It is true that the Solicitor cannot raise a new ground of rejection or apply a new rationale to support a rejection in appeals from decisions of the board."); In re Hounsfield, 699 F.2d 1320, 1324, (Fed. Cir. 1983) (refusing to consider new grounds that the Board did not accept); In re Strahilevitz, 668 F.2d 1229, 1234 n.7 (CCPA 1982) ("[I]t is well settled that, on appeal to this court, the Solicitor cannot raise a new ground of rejection or apply a new rationale to support the rejection affirmed by the board."); In re Zahn, 617 F.2d 261, 269 (CCPA 1980) ("We have in mind questions on which we can express no opinion because we are a court of review and do not pass on issues not raised."); In re

<u>Altenpohl</u>, 500 F.2d 1151, 1159 n.11 (CCPA 1974) (refusing to consider new arguments made for the first time on appeal); <u>In re Corth</u>, 478 F.2d 1248, 1253 (CCPA 1973) ("[I]t is too well settled to require citation of authority that we review only rejections made by the Patent Office in its examining and internal appellate functions and do not consider grounds of rejection presented for the first time in the brief of its solicitor."); <u>In re Nygard</u>, 341 F.2d 924, 928-29 (CCPA 1965) (New arguments "should be made in the Patent Office where appellant has the opportunity to answer them as contemplated by the statute, 35 U.S.C. § 132, and the rules, Rule 104(b), and not presented to [the appellant] for the first time in this court. This court is a court of review and reasons for rejection not made in the Patent Office are not properly before us."); <u>see also</u> 4 Donald S. Chisum, <u>Chisum on Patents</u> § 11.06[3][b][iv] ("The court will not consider . . . (2) new grounds for rejection suggested by the PTO Solicitor, (3) arguments by the applicant not presented to the PTO, or (4) points not briefed or argued by the appellant. The court itself may not affirm a rejection on a new ground. . ."); Robert L. Harmon, <u>Harmon on Patents</u> § 34.8 (2007) ("In the interest of an orderly and fair administrative process, it is inappropriate for the Federal Circuit to consider new grounds of rejection.").

Even if our long line of precedent that we do not consider a new ground of rejection for the first time on appeal could be distinguished when a new ground is a pure question of law, it seems unwise in this case.[7] Our prior refusals have cited respect for

---

[7]   The concurrence attempts to justify reaching the never decided, unraised issue of statutory subject matter because "in an <u>ex parte</u> Patent & Trademark Office proceeding, there is no adverse party who could have raised the issue of statutory subject matter." If, as in this case, the PTO determines the claims are unpatentable due to obviousness, it is irrelevant whether they also recite unpatentable subject matter. They are unpatentable either way. If the PTO mistakenly allows claims which the court believes to be unpatentable subject matter, we must wait for a case, which will surely

the administrative process and fundamental fairness as the basis for refusing to consider new grounds of rejection on appeal. See In re Lee, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002) ("Consideration by the appellate tribunal of new agency justifications deprives the aggrieved party of a fair opportunity to support its position; thus review of an administrative decision must be made on the grounds relied on by the agency."); In re Margolis, 785 F.2d 1029, 1032 (Fed. Cir. 1986) ("In the interest of an orderly and fair administrative process, it is inappropriate for this court to consider rejections that had not been considered by or relied upon by the Board."); In re Armbruster, 512 F.2d 676, 678 n.2 (CCPA 1975) ("The practice of raising such matters at this stage of the prosecution is unfair to the other party, adds to the burden of the court, and serves to obscure the raising party's position on the issues that actually were raised below.").

These considerations apply equally to this case. As the Ninth Circuit has explained:

> First, the rule that a case may be affirmed on any ground supported by the record is one driven by efficiency considerations. Where precisely the same result could have been reached on other grounds apparent from the record, sending the case back to the district court is wasteful both for the courts and for the litigants. See SEC v. Chenery, 318 U.S. 80, 88 (1943).
>
> At the same time, the affirm-on-any-ground rule does disregard the usual relationship between trial and appellate courts. Usually, an appellate court does not consider legal issues in the first instance but instead has the benefit of the district judge's initial analysis. Our judicial system generally assumes that consideration of an issue at both the trial court and appellate court level is more likely to yield the correct result, because the issue will be more fully aired and analyzed by the parties, because more judges will consider it, and because trial judges often bring a perspective to an issue different from that of appellate judges. It is to assure two-level consideration that issues usually cannot be raised in

---

come through litigation when the patentee later attempts to assert such claims against a competitor. See John P. Stevens, Some Thoughts on Judicial Restraint, 66 Judicature 177, 183 (1982) ("The doctrine of judicial restraint teaches us that patience in the judicial resolution of conflicts may sometimes produce the most desirable result.").

appellate courts in the first instance, but instead are waived (or reviewed only for plain error) if not raised before the district court.

Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1154 (9th Cir. 2000) (declining to reach alternate legal issues on appeal because the alternative legal issue would result in a remand not an affirmance). Despite the fact that an appellate court reviews issues of law de novo, there is an advantage to having these issues first resolved by the lower tribunal—in this case the expert agency charged with examining patent applications.

C.

Particularly puzzling is the panel's decision to remand the § 101 issue to the PTO with regard to the machine claims, but not the process claims. Setting aside for a moment the fact that the PTO already rejected these claims as obvious, why remand the machine claims to the PTO for the agency to consider whether they are directed to patentable subject matter, but not the process claims? This panel decides that the process claims are directed to unpatentable subject matter, but remands the machine claims to the PTO for the PTO to consider whether they are directed to unpatentable subject matter. The original panel opinion which held these machine claims were directed to patentable subject matter cited Federal Circuit and Supreme Court precedent. None of this precedent has changed.

We have a long line of precedent, including our en banc decision in In re Alappat, 33 F.3d 1526 (Fed. Cir. 1994), which holds that machine claims are patent eligible subject only to the Supreme Court's exceptions to patentability (abstract idea, natural phenomena, or law of nature). Id. at 1541-42 ("Because claim 15 is directed to a 'machine,' which is one of the four categories of patentable subject matter enumerated

in § 101, claim 15 appears on its face to be directed to § 101 subject matter."); In re Warmerdam, 33 F.3d 1354, 1360 (Fed. Cir. 1994) (holding that a claim directed to a machine containing data structures "is for a machine, and is clearly patentable subject matter").

Our recent decision in In re Bilski, 545 F.3d 943 (Fed. Cir. 2008) (en banc) did nothing to change this. In Bilski, we held process claims not directed to patentable subject matter because they did not meet the statutory definition of the word process. Indeed, we went to great lengths in Bilski to clarify that the decision was limited to process claims,[8] and further limited to process claims not involving a machine.[9] Because Bilski's definition of process cannot affect the Alappat standard for the machine claims at issue here, machine claims are, according to our precedent, directed to patentable subject matter. Nothing in Bilski unsettled this settled law which binds this court and the PTO. To be sure, I am not suggesting that the panel should have decided § 101 with regard to the machine claims any more than it should have decided § 101 with regard to the process claims. The issue before our court was the obviousness of

---

[8]    Id. at 951 ("The statute thus recites four categories of patent-eligible subject matter: processes, machines, manufactures, and compositions of matter. It is undisputed that Applicants' claims are not directed to a machine, manufacture, or composition of matter. Thus, the issue before us involves what the term 'process' in § 101 means, and how to determine whether a given claim—and Applicants' claim 1 in particular—is a 'new and useful process.'").

[9]    Id. at 962 ("As to machine implementation, Applicants themselves admit that the language of claim 1 does not limit any process step to any specific machine or apparatus. As a result, issues specific to the machine implementation part of the test are not before us today." (citation omitted)). We certainly left open the issue of which processes that are tied to a machine are patent eligible—but this only pertains to process claims that involve machines in their process. This is unquestionably different from a machine claim.

Mr. Comiskey's claims. Rather than reach out to decide an issue not raised, and remand some of the claims to the PTO with a mandate that they consider an issue of our choosing, I believe we had an obligation to decide the only issue actually decided by the PTO – are Mr. Comiskey's claims obvious? The PTO, an expert agency, is charged with examining patent applications. Courts, like us, are charged with reviewing agency determinations. There must be some limit to appellate court authority to review agency action, and in my opinion this court in Comiskey crossed the line.

I fear the sweeping application this new rule of appellate authority may have—the scope of which would naturally extend beyond patent law to agency review more generally.[10] This court may now decline to address the bases provided by any agency for its actions, and instead decide a legal ground of our choosing even when it does not result in an affirmance of the agency action and even when it results in a remand. This court should take Comiskey en banc to review its creation of such broad appellate authority that I believe to be contrary to both the letter and spirit of the Supreme Court's exception in Chenery.

---

[10]    See Morse v. Frederick, 127 S. Ct. 2618, 2641-42 (2007) (Breyer, J., concurring in the judgment in part, dissenting in part) (The "'cardinal principle of judicial restraint' is that 'if it is not necessary to decide more, it is necessary not to decide more.' PDK Labs., Inc. v. Drug Enforcement Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)."); Bringham City v. Stuart, 126 S. Ct. 1943, 1950 (2006) (Stevens, J., concurring) ("[A] policy of judicial restraint— one that allows other decisional bodies to have the last word in legal interpretation until it is truly necessary for this Court to intervene—enables this Court to make its most effective contribution to our federal system of government.").

# United States Court of Appeals for the Federal Circuit

2006-1286
(Serial No. 09/461,742)

IN RE STEPHEN W. COMISKEY

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

NEWMAN, <u>Circuit Judge</u>, dissenting from denial of the petition for rehearing en banc.

Reconsideration of this appeal was stayed while the en banc court decided <u>In re Bilski</u>, 545 F.3d 943 (Fed. Cir. 2008), and although the original <u>Comiskey</u> opinion was withdrawn because it was producing "misunderstanding," <u>id.</u> at 960, the revised opinion does not clarify, changes no result, adds no analysis, but simply deletes its reasoning, leaving silence rather than understanding. The court continues to present a broad and ill-defined exclusion of "business methods" from access to the patent system, an exclusion that is poorly adapted to today's new and creative modalities of data handling and knowledge utilization. I must protest this further contribution to the uncertainty that this court's decisions are producing.

This is not a simple case-specific adjudication between adverse interests. It can affect many thousands of vested property rights and the businesses that rely on such property. If these forms of property rights of the modern age are to be further withdrawn

from access to the patent system, it should not be done in ignorance of the commercial effect. It should not be done in disregard of the effect on future innovation or on the public and national interest in new methods and conveniences. The uncertainty that is being engendered is tantamount to invalidation, for the cost of litigation can deter all but the deepest pockets. The losers include the public, as the benefits of the "knowledge economy" are slowed, along with the nation's leadership in commercial advance based on "knowledge" products.[1]

The industries identified with information-based and data-handling processes are as diverse as banking and finance, insurance, data processing, industrial engineering, and medicine. The United States Patent and Trademark Office (USPTO) reports that in Patent Class 705, the examination classification associated with "business methods," almost 10,000 patent applications were filed in FY 2006, and over 40,000 applications were filed since FY 98 when State Street Bank was decided. See Wynn W. Coggins, Group Director, USPTO, Update on Business Methods for the Business Methods Partnership Meeting 6 (2007), available at http://www.uspto.gov/web/menu/pbmethod/partnership.pps. Until the shift represented by Bilski and now by today's decision, statute and precedent have provided stability in

---

[1]     Economists have recently started to consider these issues. See, e.g., Bronwyn H. Hall, Business Method Patents, Innovation, and Policy 1 (Nat'l Bureau of Economic Research, Working Paper No. 9717, 2003) ("Although much of this literature provides a fairly thorough analysis of individual cases and what they signify, there is relatively little literature on the impact of business method patents that is based on a more broad-based or empirical approach."); Jeffrey R. Kuester & Lawrence E. Thompson, Risks Associated with Restricting Business Method and E-Commerce Patents, 17 Ga. St. U. L. Rev. 657, 689 (2001) ("As with any economic decision, it is easy to criticize the status quo by presenting only the costs. What is needed is a more objective evaluation that considers the substantial costs (and benefits) associated with limiting business method patents.").

the rapidly moving and commercially vibrant fields of the Information Age.  Adherence to settled law is of particular importance "in cases involving property and contract rights, where reliance interests are involved."  Payne v. Tennessee, 501 U.S. 808, 828 (1991); see United States v. Title Ins. & Trust Co., 265 U.S. 472, 486 (1924) (declining to overrule precedent where prior ruling "has become a rule of property, and to disturb it now would be fraught with many injurious results").

Despite the economic importance of these interests, the consequences of our decisions have not been considered.  As the Court stated in Diamond v. Chakrabarty, 447 U.S. 303 (1980): "The choice we are urged to make is a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot."  Id. at 317; see Parker v. Flook, 437 U.S. 584, 595 (1978) ("Difficult questions of policy concerning the kinds of programs that may be appropriate for patent protection and the form and duration of such protection can be answered by Congress on the basis of current empirical data not equally available to this tribunal.").

Following is an outline of my concerns with the panel decision, concerns that warrant en banc attention:

I

The Section 101 split between Comiskey's method and system claims does not conform with any relevant statute or advance any known policy.

Both Comiskey's "method" claim 1 and "system" claim 17 are for "mandatory arbitration resolution regarding one or more unilateral documents," both including the steps of "enrolling a person," "incorporating arbitration language," "requiring a

complainant to submit a request," "conducting arbitration resolution," "providing support to the arbitration," and "determining an award." The claims arise from the same specification, and would be infringed by identical acts. If these steps are viewed as "abstractions," as in Bilski, and if the Bilski negation of abstract ideas is overcome by so simple a drafting gambit as reciting in the claims that a computer or other device (a calculator? an abacus?) may be used, we should be clear. The thousands of issued patents and pending applications that are now under a cloud, as well as the value of future innovations of unknown types, require that this court clarify the uncertainty created in Comiskey as well as in Bilski.

If the replacement of "process" with "system" or "module" in the Comiskey claims suffices to provide Bilski's "meaningful limits" under Section 101, we should be explicit. Instead, the panel chose to delete its statement that the "routine addition of modern electronics" to a patent-ineligible invention is "prima facie obvious." Comiskey, 499 F.3d at 1380, and also deleted the citation to KSR v. Teleflex, 550 U.S. 398 (2007) from which this statement came, confounding the difference between unpatentability under Section 103 and ineligibility under Section 101. Instead of the half-decision of the panel, the issue of Section 101 should either be remanded as to all claims, or decided as to all claims. And in all events, the court should decide the Section 103 ground on which the appeal was taken.

II

The panel broadly removes "business methods" from eligibility for patenting. However the innovation incentive provided by the patent system does not turn on

whether mind or machine performs new and unobvious processes of practical utility and commercial value. As was recognized by Justice Story:

> Patents for inventions are now treated as a just reward to ingenious men, and as highly beneficial to the public, not only by holding out suitable encouragements to genius and talents and enterprise; but as ultimately securing to the whole community great advantages from the free communication of secrets, and processes, and machinery, which may be most important to all the great interests of society, to agriculture, to commerce and to manufactures, as well as to the cause of science and art.

Blanchard v. Sprague, 3 F. Cas. 648, 650 (C.C. Mass. 1839). The Court continued to recognize these purposes, as new fields of science and new forms of technology have tested the traditional definitions:

> The subject-matter provisions of the patent law have been cast in broad terms to fulfill the constitutional and statutory goal of promoting "the Progress of Science and the useful Arts" with all that means for the social and economic benefits envisioned by Jefferson. Broad general language is not necessarily ambiguous when Congressional objectives require broad terms.

Chakrabarty, 447 U.S. at, 315 (quoting Const. art 1 §8). Fulfillment of these goals does not turn on whether the advance in the useful Arts includes steps performed in the mind or by a machine; it turns on the novelty and unobviousness of the advance. Human intellectual activity can take many forms, rendering boundaries difficult to draw, as the Court recognized in Flook:

> The line between a patentable "process" and an unpatentable "principle" is not always clear. Both are "conception[s] of the mind, seen only by [their] effects when being executed or performed."

437 U.S. at 589 (quoting Tilghman v. Proctor, 102 U.S. 707, 728 (1880)) (alterations in original). The inclusion of steps performed by the mind need not bar access to patentability; there must be room to evaluate the steps in terms of the criteria of

patentability. For example, in Application of Prater, 415 F.2d 1393 (CCPA 1969), the court considered an invention that required comparing the characteristics of spectra, and observed that the claim "does read on a mental process augmented by pencil and paper markings." Id. at 1395. The court referred to the "infinite variety" of mental and physical steps, and recognized the inappropriateness of adopting a rigid rule for all factual situations:

> Between the purely mental and purely physical end of the spectrum there lies an infinite variety of steps that may be either machine-implemented or performed in, or with the aid of, the human mind (e.g., "comparing" and "determining"). In ascertaining whether a particular step is "mental" or "physical," each case must be decided on its own facts, considering all of the surrounding circumstances, to determine which end of the spectrum that step is nearer. It may well be that the step of "comparing" may be "mental" in one process, yet "physical" in another.

Id. at 1402 n.22.

The panel nonetheless holds that because Comiskey's process claims do not specify that a computer is used, there is not threshold eligibility for patenting. The Comiskey process is not a "law of nature, natural phenomenon, or abstract idea," the exceptions to patentability discussed in Bilski. 545 F.3d at 952. The Comiskey process is not a "mental process," and Comiskey's patent specification states that "[a]ccess to mandatory arbitration system . . . may be established through the Internet, intranet, World Wide Web, software applications, telephone, television, cable, video [or radio], magnetic, electronic communication, or other methods of establishing communication."

Thus the panel, intermingling patentability and eligibility, continues to enlarge the ineligibility category. Although the panel states that this result is required by Flook and by Benson, these cases dealt with mathematical formulae in computer implemented processes; they did not decide the questions now decided by the panel. Rather, the

Court signaled restraint, at the dawn of the computer age. For example, in <u>Flook</u> the Court explained: "As in <u>Benson</u>, we assume that a valid process patent may issue even if it does not meet one of these qualifications [machine implementation or transformation] of our earlier precedents." 437 U.S. at 589 n.9.

Restraint is no less advisable today.

III

The panel, seeking support, turns to the British Statute of Monopolies. The law of the United States was not decided in England in 1623. As I discussed in connection with the <u>Bilski</u> decision, 545 F.3d at 985-89, serious inaccuracies are embodied in the statements that the Statute of Monopolies of 1623 was intended by the Framers as a limit to process patents under Article I, §8 of the United States Constitution. The panel now imports this theory into a decision of the court, ruling that "the Framers consciously acted to bar Congress from granting letters patent in particular types of business." Op. at 15. Thus the panel holds that the Statute of Monopolies forbids United States patents on business method inventions, and that the Framers so intended.

The Statute of Monopolies did not eliminate patents for any kind of inventions. The Statute was directed to eliminating "odious monopolies," such as patronage grants and other favors of the Crown. The Statute rendered "utterly void" all "Monopolies and all Commissions, Grants, Licenses, Charters and Letters Patent" that were directed to "the sole Buying, Selling, Making, Working or Using any Thing within this Realm," 21 Jac. 1, c.3, § I (Eng.), but specifically excepted Letters Patent for inventions from that exclusion, <u>id.</u> § VI. The only new limitation on patents for invention was a fourteen-year

term of exclusivity.  See Ramon A. Klitzke, Historical Background of the English Patent

Law, 41 J.P.O.S. 615, 649 (1959).

In enacting the Statute of Monopolies, the British Parliament assured that patents

on inventions were preserved.  See Graham v. John Deere Co., 383 U.S. 1, 5 (1966).

Today's holding that on this ground the Framers intended and acted to exclude from the

Constitution inventions that are called "business methods" is strange indeed.  Until now,

this interpretation of British and American history has lain undiscovered, although

extensive scholarship has analyzed the British statute as well as the origins of the

United States patent system.[2]  The United States Supreme Court has long recognized

the distinction between the odious monopolies that were the target of the English

Statute of Monopolies, and patents for invention, which serve the public interest:

> Though often so characterized a patent is not, accurately speaking, a monopoly, for it is not created by the executive authority at the expense and to the prejudice of all the community except the grantee of the patent. The term 'monopoly' connotes the giving of an exclusive privilege for buying, selling, working, or using a thing which the public freely enjoyed prior to the grant.  Thus a monopoly takes something from the people.  An

---

[2]        Scholarly histories include M. Frumkin, The Origin of Patents, 27 J.P.O.S. 143 (1945); E. Wyndham Hulme, Privy Council Law and Practice of Letters Patent for Invention from the Restoration to 1794, 33 L.Q. Rev. 63 (Part I), 180 (Part II) (1917); Hulme, On the History of Patent Law in the Seventeenth and Eighteenth Centuries, 18 L.Q. Rev. 280 (1902); Hulme, The History of the Patent System Under the Prerogative and at Common Law, 12 L.Q. Rev. 141 (1896); Ramon A. Klitzke, Historical Background of the English Patent Law, 41 J.P.O.S. 615 (1959); Christine MacLeod, Inventing the Industrial Revolution: The English Patent System 1660-1800 (1988); Frank D. Prager, Historic Background and Foundation of American Patent Law, 5 Am. J. Legal Hist. 309 (1961); Brad Sherman & Lionel Bently, The Making of Modern Intellectual Property Law: The British Experience 1760-1911 (1999); Edward C. Walterscheid, The Early Evolution of the United States Patent Law: Antecedents, printed serially at J. Pat. & Trademark Off. Soc'y ("J.P.T.O.S.") 76:697 (1994) (Part 1); 76:849 (1994) (Part 2); 77:771, 847 (1995) (Part 3); 78:77 (1996) (Part 4); 78:615 (1996) (Part 5, part I); and 78:665 (1996) (Part 5, part II) (hereinafter "Early Evolution "); and Edward C. Walterscheid, To Promote the Progress of Useful Arts: American Patent Law and Administration 1798-1836 (1998).

> inventor deprives the public of nothing which it enjoyed before his discovery, but gives something of value to the community by adding to the sum of human knowledge.  He may keep his invention secret and reap its fruits indefinitely.  In consideration of its disclosure and the consequent benefit to the community, the patent is granted.

United States v. Dubilier Condenser Corp., 289 U.S. 178, 186 (1933) (citations and footnote omitted).

As I mentioned in connection with Bilski, the Statute of Monopolies did not discuss the categories of inventive subject matter eligible for a British patent.  See Prager, Historical Background and Foundation of American Patent Law, 5 Am. J. Legal Hist. at 313 ("The statute [of Monopolies] said nothing about meritorious functions of patents, nothing about patent disclosures, and nothing about patent procedures; it was only directed against patent abuses.").  Patents for inventions had been granted by the Crown long before 1623.  See Hulme, The History of the Patent System Under the Prerogative and at Common Law, 12 L.Q. Rev. at 143 (the first patent grant to the "introducer of a newly-invented process" was in 1440); see also Klitzke, Historical Background of the English Patent Law, 41 J.P.O.S. at 626-27 (discussing the first patents for "invention" in England in the fifteenth century).  That practice was deliberately unaffected by the terms of the Statute of Monopolies, which explicitly excepted patents for inventions.

In analyzing the British system of patents at the time of the American Revolution, scholarship has made clear that patents were broadly available.  It is simply incorrect now to hold that the Statute of Monopolies foreclosed the patenting of any "business method," either in England or in the United States.  "Business method" patents are shown on the list of British patents of the era, published by Bennet Woodcroft,

Alphabetical Index of Patentees of Inventions 383, 410 (U.S. ed.1969); e.g., British Patent No. 1197 to John Knox (July 21, 1778) ("Plan for assurances on lives of persons from 10 to 80 years of age"); Patent No. 1170 to John Molesworth (Sept. 29, 1777) ("Securing to the purchasers of shares and chances of state-lottery tickets any prize drawn in their favor"); Patent No. 1159 to William Nicholson (July 14, 1777) ("Securing the property of persons purchasing shares of State-lottery tickets").   Later British patents can also be described as "business methods," e.g., Patent No. 10,367 to George Robert D'Harcourt (Oct. 29, 1844) ("Ascertaining and checking the number of checks or tickets which have been used and marked, applicable for railway officers").  It is apparent that "business method" or "human activity" patents were not excluded from the English patent system in 1623.

Just as most of the patents of an earlier era arose from the dominant innovative technologies of that era, modern inventions arise from today's innovative advances in communications and computing.  See USPTO White Paper Automated Financial or Management Data Processing Methods (Business Methods) 4, available at http://www.uspto.gov/web/menu/busmethp/whitepaper.pdf ("The full arrival of electricity as a component in business data processing system[s] was a watershed event.")  This USPTO Paper describes the history of financial apparatus and method patents dating back to 1799, including patents on bank notes, bills of credit, bills of exchange, check blanks, detecting and preventing counterfeiting, coin counting, interest calculation tables, and lotteries, all within the first fifty years of the United States patent system.  USPTO White Paper at 3-4 and appendix A.  These older financial and business-oriented innovations were not deemed ineligible for patenting, although they involved

mental and intellectual steps. The patent system in the United States was directed to the ambitions of the nation to promote progress of the useful arts, not to reward faithful subjects. In Blanchard, supra, Justice Story remarked on the American "liberal view" of invention:

> In America this liberal view of the subject has always been taken; and indeed, it is natural, if not a necessary result, from the very language and intent of the power given to congress by the constitution [1 Stat. 14] on this subject. . . . Patents, then, are clearly entitled to a liberal construction, since they are not granted as restrictions upon the rights of the community, but are granted "to promote science and useful arts."

3 F. Cas. at 650 (brackets in original).

This statement reflects the nation's disposition toward a broad incentive to technological advance; surely it does not suggest that the scope of the Patent Acts of 1790 and 1793 was sub rosa restricted in 1623, and first discovered by the Federal Circuit in 2008. With all respect to this panel, the judicial role is to apply precedent, not to rewrite history.[3]

IV

Uncertainty is the enemy of commercial investment. The role of patent systems in the allocation of resources is of ever-increasing economic importance, as technology dominates the economic future. See, e.g., F. Scott Kieff, Property Rights and Property Rules for Commercializing Inventions, 85 Minn. L.Rev. 697, 699 (2001) (discussing relationships between patent systems and economic growth); Kenneth W. Dam, The

---

[3] Other mistaken views of precedent appear in the panel opinion. For example, the reason why the Supreme Court in Rubber-Tip Pencil Co. v. Howard, 87 U.S. 498 (1874), stated that "An idea of itself is not patentable," id. at 507, was not because the rubber-tip pencil was "an abstract concept that has no practical application," as my colleagues state, panel op. at 17, but because "the idea of this patentee was a good one, but his device to give it effect, though useful, was not new." 87 U.S. at 507.

Economic Underpinnings of Patent Law, 23 J. Legal Stud. 247 (1994) (analyzing how creation of property rights in technology encourages investment in innovation).

The artificial distinction drawn by the Comiskey panel adds neither strength nor rigor to the pragmatic needs of economic growth, and simply serves as a further disincentive to innovation. Thus I must, respectfully, dissent from the court's denial of the petition for rehearing en banc.